UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61907-CIV-ALTMAN

**TRICIA J. THOMPSON**,

    *Plaintiff*,

v.

**WAL-MART STORES EAST, L.P.**,

    *Defendant*.

_____/

## ORDER

The Plaintiff, Tricia Thompson, slipped and fell in a Wal-Mart store. After Thompson sued Wal-Mart in state court, Wal-Mart removed the case here and, after some discovery, moved for summary judgment. In its motion—now before us—Wal-Mart insists that it *couldn't* have known about the dangerous condition Thompson slipped on. And, Wal-Mart says, Thompson has failed to adduce any evidence that it *should* have known. For many of the same reasons we outlined in a recent case, *Torres v. Wal-Mart Stores East, L.P.*, 2021 WL 3634632 (S.D. Fla. 2021) (Altman, J.), we disagree and now **DENY** the motion.[1]

---

[1] Wal-Mart's Motion for Summary Judgment (the "MSJ") [ECF No. 33] is now ripe for resolution, *see* Response [ECF No. 39]; Reply [ECF No. 42].

**THOMPSON'S VIOLATION OF LOCAL RULE 56.1**

Before we begin, however, we address Wal-Mart's position that Thompson's Statement of Material Facts in Support of her Response to the Motion (the "Response SOF") [ECF No. 39 at 2–3] violates our Local Rule 56.1. We agree with Wal-Mart that Thompson has violated the Rule in three main ways (though, as we'll soon see, we don't think this violation entitles Wal-Mart to summary judgment). *First*, Thompson didn't file her Response SOF "separate[ly] and contemporaneously" with her Response, as Local Rule 56.1(a)(1) & 56.1(b)(1) require. Instead, she embedded her Response SOF *within* her Response. *See* Response at 2–3. *Second*, she didn't organize her Response SOF so as to "correspond with the order and paragraph numbering format used by the movant [Wal-Mart]," as required by Local Rule 56.1(b)(2)(A). She just used her own format. *See* Response at 2–3. *Third*, she didn't dispute any of the facts in Wal-Mart's Statement of Material Facts in Support of its Motion for Summary Judgment ("Wal-Mart's SOF") [ECF No. 34], as required by Local Rule 56.1(a)(2), 56.1(b)(2)(B) & (C). She simply outlined her own facts. *See* Response at 2–3. And these three violations *do* entitle Wal-Mart to relief.

What kind of relief? Well, Wal-Mart asks us to admit the assertions it makes in its SOF. *See* Reply at 1–2 (arguing that Thompson's Response SOF is procedurally deficient and that Wal-Mart's SOF should be deemed admitted). And Wal-Mart is right to point out that "[a]ll material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply." S.D. FLA. L.R. 56.1(c). We'll therefore "deem[ ] admitted" every properly supported factual assertion in Wal-Mart's SOF. For two reasons, however, we won't strike Thompson's Response SOF. *One*, some of her factual averments are properly supported by record evidence—even though they're presented in an improper format. *Two*, with trial just around the corner, we don't have the time to do

what we otherwise might have done—which is to strike Thompson's Response SOF and order her to submit a new one. *Cf.* S.D. FLA. L.R. 56.1(d) (explaining that the Court "may"—but need not—strike a non-conforming statement of material facts). So, while we accept all of Wal-Mart's facts, we ultimately don't think that decision makes the least bit of difference to the result.

## THE FACTS[2]

### A. Thompson's Fall

On August 9, 2019, Thompson walked into a Wal-Mart in Pembroke Pines—a store she visited about once a month—to buy toiletries and napkins. *See* Thompson Dep. at 46:15–18; 47:8–10. It had been raining earlier that day, and it was still drizzling when Thompson arrived. *See id.* at 47:23–48:1. So, she brought her umbrella into the store, pushed it into an umbrella bag, and dried her feet before starting her shop. *See id.* at 48:2–48:10. After shopping around the store for about fifteen minutes, Thompson paid for her items at a register and began walking towards the exit. *See id.* at 49:7–8. As she walked, she held her items in her left hand and her umbrella in her right, and she carried a "messenger" bag over her shoulder. *See id.* at 49:13–50:4. As she put her receipt into her bag, her left leg "slid[ ] forward," her left knee "hyperextended," and her body collapsed onto the floor. *See id.* at 50:7–51:20.

Thompson didn't see any colored liquid on the floor *before* she fell. *See id.* at 52:1–52:10. Thompson also doesn't know how long the floor was wet before she slipped, how the floor became

---

[2] We draw these "facts" from Wal-Mart's SOF, Thompson's Response SOF, Wal-Mart's Reply SOF [ECF No. 43], and the record evidence cited in the briefing, including:
    (i)    the closed-circuit television footage of the incident ("CCTV") [ECF No. 39-2];
    (ii)   Thompson's deposition testimony ("Thompson Dep.") [ECF Nos. 33-1, 39-1, 42-1];
    (iii)  the deposition testimony of former Wal-Mart employee Danielle Somera Gross ("Gross Dep.") [ECF Nos. 33-2, 42-7];
    (iv)  the deposition testimony of former Wal-Mart employee Quintin Virgin ("Virgin Dep.") [ECF Nos. 33-3, 42-2];
    (v)   the deposition testimony of Wal-Mart employee Nathalie Williams Cooper ("Cooper Dep.") [ECF Nos. 33-4, 42-6];

3

wet, or whether any Wal-Mart employees knew about the puddle on the floor. *See id.* at 55:20–56:14. After the fall, Thompson saw a "footprint" and a "skid mark" on the spot where she slipped. *See id.* at 52:11–55:13. And photographs taken of the scene shortly after the fall show multiple marks and streaks in the area of Thompson's fall. *See* Pictures [ECF Nos. 42-4 at 32–35].

Wal-Mart's CCTV footage is somewhat grainy, and it's partially obstructed by a structural column. Still, we *can* glean some things from the footage—all of it unhelpful to Wal-Mart. In the hour before Thompson's fall, the camera shows dozens of customers and Wal-Mart employees passing through the area where Thompson later fell—some walking, some pushing traditional shopping carts, others piloting automatic carts. *See* CCTV at 3:52:20–4:55:00. Then, in the *minutes* before the fall: (a) three Wal-Mart employees—two of whom were engaged in conversation and eyeing other parts of the store—walked directly past the spot on which Thompson would soon slip, *see id.* at 4:53:21–4:54:10; and, seconds later, (b) two customers maneuvered their carts right over that same spot, *see id.* at 4:54:27. A few seconds after that, we can see Thompson walking towards the exit. *See id.* at 4:55:09. When she got to the column, she walked between the column's right side and another shopping cart that was being pushed just behind her and to her right. *See id.* at 4:55:10. Unfortunately, the column prevents us from seeing Thompson's next step, which is the one she slipped on. *See id.* at 4:55:11. We thus never see how or why her left leg slid forward.

The camera then shows several people moving to help Thompson, and we can see a Wal-Mart employee directing other customers away from her. *See id.* at 4:55:50. Other Wal-Mart employees then brought over some towels and a mop to clean the floor. *See id.* at 4:56:00–5:01:00. Ultimately, someone helped Thompson up and loaded her into a wheelchair. *See id.* at 5:08:00. The next day, Thompson

---

(vi) the deposition testimony of Wal-Mart employee Dievela Aristide ("Aristide Dep.") [ECF Nos. 39-3, 42-3]; and
(vii) the paper discovery Wal-Mart attached to its Reply [ECF Nos. 42-4, 42-5].

learned that she had torn the lateral collateral ligament ("LCL") in her left knee. *See* Thompson Dep. at 35:5–6.

### B. The Deposition Testimony of Wal-Mart's Employees

In its SOF, Wal-Mart cites the deposition testimony of three employees—Danielle Gross, Quintin Virgin, and Natalie Williams Cooper—for the following three propositions: (1) neither Thompson nor any Wal-Mart employee actually knows *what* Thompson slipped or *how long* that substance may have been on the floor, *see* Wal-Mart's SOF ¶¶ 7–11, 13–15, 23–27, 30–31; (2) on rainy days, water generally didn't tend to accumulate in the area where Thompson fell, *see id.* ¶¶ 22, 33–34, 40–41; and (3) slip-and-fall incidents were exceedingly rare in the area where Thompson slipped, *see id.* ¶¶ 16–17, 19–20, 36–37, 42–43.

Each of those employees, however, testified to being familiar with Wal-Mart's procedures for safeguarding its stores on bad-weather days.[3] Gross, for instance—a former cashier who was working nearby when Thompson fell—testified that she was trained to observe the store's floors. *See* Gross

---

[3] Thompson attaches to her Response written versions of the policies that (she claims) Wal-Mart implemented. *See* Wal-Mart's "Inclement Weather Policy" [ECF No. 39–4]; Wal-Mart's "Department Safety Solutions" [ECF No. 39–5]. Thompson contends that Wal-Mart violated these policies and insists that, in doing so, Wal-Mart was negligent. *See* Response at 6 ("However, other methods of proving constructive notice exist. Evidence of a business owner's neglect in inspecting its premises may establish constructive knowledge. The most common examples are when a business owner fails to follow its own implemented inspection procedures or fails to inspect its premises at a reasonable rate." (citing *Garcia v. Wal-Mart Stores E., L.P.*, 2015 WL 898582, at *3 (M.D. Fla. 2015))). But Wal-Mart disputes the authenticity of these written policies and denies having produced them to Thompson in discovery. *See* Reply at 5 ("It is not known where or when the Plaintiff obtained those policies and procedures. Further, there has been no corporate representative for Wal-Mart deposed on any policies and procedures that applied during the time of this incident or to authenticate any of the policies Plaintiff attempts to rely on."). Given this evidentiary dispute, we won't consider these *written* versions of the policies in adjudicating Wal-Mart's motion. We note, though, that the written policies are kind of irrelevant for our purposes given the consistent (and undisputed) testimony of Wal-Mart's employees, which (as we're about to see) strongly supports Thompson's view that (1) Wal-Mart *had* implemented certain policies for keeping its floors safe, (2) those policies *did* require employees to scan the floors for transient substances, and (3) those safety requirements were especially important on rainy days.

5

Dep. at 33:14–17 ("Q: Now, you agree that as part of your training at Wal-Mart, you're trained to be more observant of the floor[.] A: Yeah."). And she agreed that this focus on the floors was necessary to prevent the floors from staying wet for extended periods of time. *See id.* at 33:18–20 ("Q: [You're more observant of the floors] so those liquids don't stay on the floor for a very long time, would you agree to that? A: Absolutely.").

Then there's Virgin—a former asset-protection assistant manager—who likewise testified to being familiar with an "inclement weather plan," through which Wal-Mart would "have the maintenance employees [be] more proactive around the stores[.]" Virgin Dep. at 13:2–14:7.

And Cooper—an erstwhile assistant manager—testified that she was familiar with Wal-Mart's policies for inclement weather. *See* Cooper Dep. at 5:20–9:9. The relevant portion of her deposition went like this:

> Q. You have added strategies to prevent water from getting inside the store when it's raining outside, do you agree to that?
>
> A. Yes, sir.
>
> Q. So, when it's raining outside, do you agree that there is a higher possibility of water getting inside the store?
>
> A. It can possibly happen.
>
> Q. And because of that possibility, that's why you have those strategies?
>
> A. Yes.

*Id.* at 8:21–9:9. Those strategies, Cooper testified, include: (1) announcing inclement weather; (2) ensuring that maintenance employees place floor mats and use mops at the store's entrances; (3) requiring employees to inspect the floors; and (4) providing customers with umbrella bags. *See id.* at 6:14–8:2.

A fourth Wal-Mart employee, Aristide, testified that Wal-Mart requires its employees to clean the area where Thompson fell every fifteen minutes. *See* Aristide Dep. at 22:7–14 ("Q: This aisle, is

6

this one of the aisles that you're supposed to inspect every 15 minutes when it's raining outside? A: Yes. Yes."). Aristide even claimed that *she* had done precisely that on the day in question. *See id.* at 23:4–11. But, as Thompson points out, the CCTV footage doesn't seem to show Aristide in the area of the fall during *the hour* before Thompson fell. *See* Response at 6 ("However, the video footage provided by the defendant clearly establishes that during the 1 hour prior to Thompson's fall, Ms. Aristide was never in the area."); *see also* CCTV at 3:52:20–4:55:00.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).[4]

---

[4] In ruling on summary-judgment motions, Florida's state courts have held that "the stacking of inferences is not permitted." *Wilson-Greene v. City of Miami*, 208 So. 3d 1271, 1275 (Fla. 3d DCA 2017). In other words, "if a party to a civil action depends upon the inferences to be drawn from circumstantial evidence as proof of one fact, it cannot construct a further inference upon the initial inference in order to establish a further fact unless it can be found that the original, basic inference was established to the exclusion of all other reasonable inferences." *Cohen v. Arvin*, 878 So. 2d 403, 405 (Fla. 4th DCA 2004) (quoting *Nielsen v. City of Sarasota*, 117 So. 2d 731, 733 (Fla. 1960)). But this "rule" obviously has no application in federal court. *See Berbridge v. Sam's E., Inc.*, 728 F. App'x 929, 931–32 (11th Cir. 2018) ("Although Florida law provides the substantive rule of decision in this diversity case, we must decide the propriety of summary judgment in accordance with the federal standards fixed in Rule 56 of the Federal Rules of Civil Procedure." (cleaned up)). "Because a federal standard governs our assessment of whether an inference is allowable, we do not apply state-law rules against 'pyramiding' or 'stacking' inferences." *Id.* at 932.

## ANALYSIS

Under Florida law, a person who "slips and falls on a transitory foreign substance in a business establishment . . . must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it." FLA STAT. § 768.0755(1). A "transitory foreign substance" refers "generally to any liquid or solid substance, item or object located where it does not belong." *Owens v. Publix Supermarkets, Inc.*, 802 So. 2d 315, 317 (Fla. 2001). Thompson has elected to proceed under a theory of constructive notice: she argues, in other words, that Wal-Mart "should have known" of the dangerous condition. *Knoll v. Paradise Beach Homes, Inc.*, 789 F. App'x 809, 813 (11th Cir. 2019).

A slip-and-fall plaintiff may prove constructive knowledge through "circumstantial evidence," showing *either* that "[t]he dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition" *or* that "[t]he condition occurred with regularity and was therefore foreseeable." FLA. STAT. § 768.0755(1). The Eleventh Circuit has found that a period as short as ten minutes may be sufficient to put a defendant on constructive notice of a dangerous condition. *See Lebron v. Royal Caribbean Cruises Ltd.*, 818 F. App'x 918, 922 (11th Cir. 2020) (reversing directed verdict on issue of constructive notice where the "unsafe condition existed for at least ten minutes"); *see also D'Antonio v. Royal Caribbean Cruise Line, Ltd.*, 785 F. App'x 794, 798 (11th Cir. 2019) (reversing summary judgment and finding that "eighteen minutes was a sufficient period to present a genuine issue of material fact" on the question of constructive notice).

In assessing *how long* a substance has been sitting on a floor, courts look to several factors, including "evidence of footprints, prior track marks, changes in consistency, [or] drying of the liquid." *Palavicini v. Wal-Mart Stores E., LP*, 787 F. App'x 1007, 1012 (11th Cir. 2019). We also ask whether the "offending liquid" was "dirty" or "scuffed." *Norman v. DCI Biologicals Dunedin, LLC*, 301 So. 3d 425, 429 (Fla. 2d DCA 2020); *see also, e.g., Woods v. Winn Dixie Stores, Inc.*, 621 So. 2d 710, 711

9

(Fla. 3d DCA 1993) ("Testimony of dirt, scuffing, or tracks in a substance generates sufficient inferences of constructive notice."); *Winn-Dixie Stores, Inc. v. Guenther*, 395 So. 2d 244, 246 (Fla. 3d DCA 1981) ("Here, testimony that the liquid was dirty and scuffed and had several tracks running through it was, in our opinion, adequate to impute constructive notice of the hazardous condition to the store manager.").

Beyond the length of time, courts are more likely to find that a business had constructive notice when the business's employees were "in the vicinity of where the fall occurred." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 203 (11th Cir. 2019) (quoting *Markowitz v. Helen Homes of Kendall Corp.*, 826 So. 2d 256, 261 (Fla. 2002)); *see also Haiser v. MSC Cruises (USA) Inc.*, 2019 WL 4693200, at *5 (S.D. Fla. Aug. 9, 2019) (Smith, J.) (finding that the crewmembers "should have known about the presence of water on [the] floor since they were in the immediate vicinity"). That's because, with employees in the area, a jury can reasonably infer (at least where the condition is visible) that those employees *should've* noticed the dangerous condition.

Lastly, "circumstantial evidence of a business owner's neglect in inspecting its premises may establish constructive knowledge." *Garcia*, 2015 WL 898582, at *3. This includes a business violating its own policies and procedures or failing to inspect its store within reasonable increments. *Id.*; *see also Kertz v. United States*, 2013 WL 1464180, at *3 (M.D. Fla. Apr. 10, 2013) (inferring constructive knowledge where post office failed to follow its own inspection policy); *Kenny v. United States*, 2012 WL 523624, at *3 (M.D. Fla. Feb. 16, 2012) (same); *Jenkins v. Brackin*, 171 So. 2d 589, 591 (Fla. 2d DCA 1965) (inferring constructive knowledge where grocery store failed to inspect its floors fifteen to twenty minutes before plaintiff's fall).

Drawing all reasonable inferences in Thompson's favor, we think a jury *could* find that Wal-Mart *should've* known about the puddle Thompson slipped on.[5]

*First*, there's evidence that the water had been accumulating for a significant period of time. Besides the footprint Thompson saw (which, in fairness, may well have been her own, *see* Thompson Dep. at 54:3–7), Thompson testified that the puddle covered a substantial area. She knows this because she "fell on the right side of the column . . . [and employees] were cleaning both the right side of the column and the left side of the column leading towards the bathroom." *Id.* at 53:21–24. Plus, Thompson noticed some track marks—which appear to have been made by shopping carts—streaking through the puddle she'd slipped on. *Id.* at 54:17–18. That's probably enough to deny summary judgment all on its own. But we don't need to take Thompson's word for it because Virgin—a Wal-Mart employee—likewise saw track marks bisecting the puddle. *See* Virgin Dep. at 50:12–13, 51:14–16. Weighing this evidence in the light most favorable to Thompson, a jury could easily find that the water had been accumulating for many minutes or hours.

*Second*, in the two minutes before Thompson fell, three Wal-Mart employees walked right by the puddle in question, and *none* of them inspected the floor. *See* CCTV 4:53:50–4:55:13. Remember, Thompson said that it had been raining that day, *see* Thompson Dep. at 47:23–25, and Wal-Mart's employees testified that, on rainy days, they were required to make sure the floors were dry. Virgin, for instance, explained that, on rainy days, there's a "greater chance for slip and fall with all the water that would come with the traffic." Virgin Dep. at 14:3–6. And he testified that "if there is inclement weather . . . we would have employees handing out umbrella bags for people coming in . . . . We would

---

[5] Wal-Mart says Thompson "cannot assert that the condition occurred with regularity and was therefore foreseeable." MSJ at 5. By never refuting this contention, Thompson has waived any argument that the condition *did* occur with regularity. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").

11

also have the maintenance employees [be] more proactive around the stores especially around the entrances where there was a lot of water." *Id.* at 13:6–12. Cooper, for her part, agreed, as the following exchange shows:

> Q. You have added strategies to prevent water from getting inside the store when it's raining outside, do you agree to that?
>
> A. Yes, sir.
>
> Q. So, when it's raining outside, do you agree that there is a higher possibility of water getting inside the store?
>
> A. It can possibly happen.
>
> Q. And because of that possibility, that's why you have those strategies?
>
> A. Yes.

Cooper Dep. at 8:21–9:9. Those strategies, Cooper testified, include: (1) announcing inclement weather; (2) ensuring that maintenance employees place floor mats and use mops at the store's entrances; (3) requiring employees to walk and inspect the floors; and (4) providing customers with umbrella bags. *See id.* 6:14–8:2. A third Wal-Mart employee (Gross) noted that, on rainy days, "[t]here's normally a maintenance associate inside the lobby that keeps mopping the floors and trying to keep the floors dry." Gross Dep. 13:1–7. And Aristide—one of Wal-Mart's maintenance employees—admitted that it was her job to inspect the area where Thompson fell every *fifteen* minutes. *See* Aristide Dep. at 22:7–14.[6]

This testimony wasn't just consistent; it makes a lot of sense. Wal-Mart, interested as it is in keeping its customers safe, directs its employees to pay extra attention to the floors on rainy days. Since August 9, 2019 was a rainy day, the three employees who passed by the (alleged) puddle should

---

[6] She even claimed to have done precisely that. *Id.* at 23:8–11. Unfortunately, according to the CCTV footage, Aristide doesn't appear in the area of the fall during *the hour* before Thompson fell. *See* CCTV at 3:52:20–4:55:11.

have been looking down at the floor. *See* Gross Dep. at 33:21–24 ("So, one of your jobs as an employee, all the employees of Walmart, is to make sure that they're looking at the floor and make sure the floor stays dry? A. Yes."); *see also* Virgin Dep. at 32:7–11 ("Q. Now, the employees are trained to always be vigilant and looking down to make sure there is no water on the floor. Is that correct? A. Yes. Not only water but any substance that might cause an accident."). But they weren't. And *that*— coupled with Aristide's very evident failure to do her own job—is probably enough for a jury to find that, had Wal-Mart's employees behaved as they *should have*, they *would've* discovered the dangerous condition.[7]

The Eleventh Circuit's treatment of similar cases lends further support to this conclusion. Take *Doudeau v. Target Corp.*, 572 F. App'x 970 (11th Cir. 2014), for example, where the Eleventh Circuit found a genuine dispute on the question of constructive notice and reversed the district court's order granting Target's motion for summary judgment. In that case, as here, "it had been raining," and an employee who helped the plaintiff off the ground had opined that "the water must have been tracked in from outside." *Id.* at 971–72. As in our case, a Target employee had walked past the area where the slip occurred only four minutes before the fall; unfortunately, "his gaze [was] not on the floor but instead at the customers." *Id.* at 972. The surveillance video did "not reveal any water being spilled on the floor between [the employee's] walkthrough and [the plaintiff's] fall." *Id.* From this, the

---

[7] Wal-Mart's policies—while they don't fix the standard of care in a negligence action—*can* be relevant to the fact-finder's determination of *what* that standard of care might be. *See Mayo v. Publix Super Markets, Inc.*, 686 So. 2d 801, 802 (Fla. 4th DCA 1997) ("We clarify that a party's own internal operating manuals are admissible if relevant to the issues raised. We reiterate, however . . . that a party's internal rule does not itself fix the legal standard of care in a negligence action[.]"). In our case, the video footage appears to show that Wal-Mart's employees failed to follow the store's inclement-weather policies. *See* CCTV 4:53:00–4:55:11. The jury might find these policies useful in their efforts to outline the outer boundaries of the applicable standard of care. And, if they decide that the policies are, in salient ways, coextensive with the legal standard, then we think they *could* use the employees' failure to adhere to those policies as substantive evidence of negligence. That is, we think they could decide that, had the employees followed Wal-Mart's protocols, they would've noticed the puddle.

13

court inferred—as we do—that "the water could have been on the floor long enough for Target to discover it." *Id.*

Our case is nearly identical. It had been raining earlier that day; there's evidence that three Wal-Mart employees ambled past the puddle just moments before the fall *without* glancing down at the floor; and the surveillance video reveals *no* spill between the employees' walkthrough and Thompson's fall. As in *Doudeau*, these facts are more than sufficient to raise a reasonable inference that the water had been there long enough for the employees to have spotted it.[8]

A similar series of events animated the decision in *Lebron*, 818 F. App'x at 918, where the Eleventh Circuit reversed the district court's order granting the defendant's motion for a directed verdict on the question of constructive notice. The *Lebron* plaintiff tripped on an ice-skating rink. *Id.* at 919. After the district court issued its directed verdict for Royal Caribbean, the Eleventh Circuit found that the "jury was entitled to find Royal Caribbean had constructive notice of the gouge in the ice" based on three facts—all present in our case. *Id.* at 922.

*One*, the court pointed to Royal Caribbean's "general knowledge of the unsafe condition at issue"—a conclusion it reached (in part) because of an employee's testimony that "it is important to maintain and resurface the ice to prevent accident and injury." *Id.* Similarly, here, Wal-Mart's asset-protection assistant manager (Virgin) testified that Wal-Mart had an inclement-weather plan for rainy days and acknowledged how important it is for employees to look for spills—as a necessary mechanism for preventing accidents. *See* Virgin Dep. at 14:3–7.

*Two*, the *Lebron* panel pointed to testimony that, on the day in question, "gouges in the ice were readily visible ten to fifteen minutes prior to [the plaintiff's] fall," which established "that the

---

[8] Indeed, Thompson's case is, in some ways, even stronger. In *Doudeau*, the puddle had no "track marks or footprints in it." 572 F. App'x at 971. Here, by contrast, both Thompson and a Wal-Mart employee saw track marks through the puddle—an indication that the substance had been around for some time.

unsafe condition existed for at least ten minutes and that the condition was detectable by a lay person on or around the ice." *Lebron*, 818 F. App'x at 922. Here, too, the circumstantial evidence—the track marks and the absence from the CCTV footage of any noticeable spill in the hour before Thompson fell—strongly suggests that the puddle had been allowed to sit in that aisle for some protracted period of time. *See generally* CCTV Footage; Pictures. And the facts indicate that the puddle was large enough to be noticeable. *See* CCTV at 4:56:12–4:57:30 (showing multiple Wal-Mart employees cleaning the area where Thompson fell on both sides of the column); *see also* Thompson Dep. at 53:12–24 ("I fell on the right side of the—the column. They were cleaning both the right side and the left side of the column leading towards the bathroom."); Virgin Dep. at 41:2–8 ("Q. Does it appear to you that [the employee] is now cleaning up the area where the customer alleged to have slipped and fallen? A. May be cleaning up the area or guarding or just looking. She was cleaning at one point[.]").

*Three*, "provid[ing] the final inference for constructive notice," three employees were "stationed in the immediate vicinity of the ice, one of whom was specifically tasked with watching the ice." *Lebron*, 818 F. App'x at 922. Our case is very similar: three Wal-Mart employees—tasked with scanning the floors and failing to do so—walked through the very same area in which, just moments later, Thompson would fall. *See* CCTV at 4:53:50–4:55:13; *see also* Virgin Dep. at 32:7–11 (confirming that Wal-Mart employees are trained to be vigilant and scan the floors for any substance that might cause an accident).

Then there's *Castellanos v. Target Corp.*, 568 F. App'x 886 (11th Cir. 2014), where the Eleventh Circuit affirmed a jury verdict for a slip-and-fall plaintiff based on "the approximately two-foot size of the puddle of bleach, the distinctive odor of bleach, the presence of tracks not made by plaintiff or her husband through the puddle, and the proximity within about ten feet of the puddle of defendant's employees." *Id.* at 886. Our case is just the same: a sizeable puddle, tracks that (at least) appear to have

15

been made by someone *other* than Thompson, the absence of any evidence of a spill in the hour before the fall, and several nearby Wal-Mart employees.

And those decisions barely scratch the surface. *See, e.g.*, *Plott*, 786 F. App'x at 202–03 (using circumstantial evidence to conclude that rain water had been on the ground "for about half an hour," noting that "two crewmembers [were] working" nearby, and finding that "a reasonable factfinder could conclude that those crewmembers knew or should have known about the wet . . . floor"); *Maxwell v. Carnival Corp.*, 2021 WL 1969967, at *6 (S.D. Fla. Mar. 18, 2021) (Bloom, J.) (denying summary judgment where the evidence indicated "that the food spill was on the floor for a period long enough for at least one other person to walk through it and for Defendant to have constructive notice of the substance"); *Snider-Hancox v. NCL Bahamas Ltd.*, 2018 WL 6308683, at *6 (S.D. Fla. Sept. 26, 2018) (Martinez, J.) (denying summary judgment where there was "a footprint in the liquid as well as dirt and grime in the puddle prior to the fall," and the area "was being staffed by at least three . . . employees at the time of the accident" who "could have noticed a liquid on the ground and understood the safety concern of that condition"); *Garcia v. Target Corp.*, 2014 WL 505151, at *3 (S.D. Fla. Feb. 7, 2014) (Marra, J.) (denying summary judgment where "there were footprints in the water on the floor . . . despite the fact that there is evidence that it was not raining the day Plaintiff fell in the store," raising "a genuine issue of material fact as to whether Defendant knew there was water on the floor but ignored it or should have discovered it earlier"); *Williams v. Carnival Corp.*, 440 F. Supp. 3d 1316, 1322 (S.D. Fla. 2020) (Torres, Mag. J.) (finding that Carnival had constructive notice of water on the ground where "a slow drip of water coming from a leaky ice chest immediately next to the puddle of water" could have taken "hours" to pool into a two-foot puddle, and noting that Carnival, like Wal-Mart here, had "employees working close to the [water] trained to look for and remedy wet decks"); *Erickson v. Carnival Cruise Lines, Inc.*, 649 So. 2d 942, 943 (Fla. 3d DCA 1995) ("We conclude that the source of the puddle (i.e. ceiling leak) as well as the size of the puddle were sufficient to create a jury

question as to whether this hazardous condition existed for a sufficient period of time to charge appellee with constructive notice and to invite corrective measures.").

Against all this, Wal-Mart cites four cases—all unavailing.

First up is *Berbridge*, whose facts Wal-Mart characterizes as "more favorable to the plaintiff" than ours. *See* MSJ at 8. But that's just not true. In that case, the plaintiff slipped on water that had been dripping from an AC unit. *See* 728 F. App'x at 930–31. The Eleventh Circuit found precious little evidence that the water "had been on the floor for a sufficient length of time to charge the store owner with constructive knowledge of its presence." *Id.* at 932. In saying so, however, the court relied on two facts—both absent here. *One*, there was no "evidence of footprints, prior track marks, change in consistency, drying of the liquid, or other evidence suggesting that the substance was on the floor for [a sufficient] length of time." *Id.* Although the plaintiff described the water as "dirty," the court pointed out that the water could've been dirty "when it fell from the AC unit." *Id.* In our case, by contrast, there *were* track marks and a footprint—the *very kinds of evidence* the court found missing in *Berbridge*. *Two*, left only with the plaintiff's description of the water as "medium size" and "[not] that big," the court said "[w]e . . . don't know the size of the substance" and added that, "[h]ad the puddle on the floor been large, that could have suggested, in light of the slow dripping observed by Berbridge, that the AC unit had been leaking for a while." *Id.* Here, however, we have Thompson's testimony that the puddle was substantial, *see* Thompson Dep. at 53:12–24—evidence she corroborated by showing that the puddle extended past either side of a thick structural column, *see* CCTV 4:57:11–4:57:30; *see also* Pictures at 32–35. And, since there's no evidence of any spill in the hour before Thompson fell, *see* CCTV at 3:52:22–4:55:1, we can reasonably assume that the puddle *either* (1) resulted from a spill that occurred *more than* one hour before *or* (2) was caused by the aggregation of many customers' rain-soaked footprints. Both scenarios, of course, lead to the same ineluctable inference—that the puddle

had been on the floor for some time.[9] *Cf. Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) ("In determining the relevant set of facts at the summary judgment stage, we must view all the evidence and make any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party."); *Carroll v. Carnival Corp.*, 955 F.3d 1260, 1262 (11th Cir. 2020) (reversing summary judgment where the district court failed to draw all factual inferences in the plaintiff's favor).

Wal-Mart also relies on the Eleventh Circuit's decision in *Pussinen v. Target Corp.*, 731 F. App'x 936 (11th Cir. 2018). There, the plaintiff fell on a liquid in the toy aisle of a Target. *Id.* at 937. But the plaintiff in that case *conceded* that "the liquid was clear and had no track or dirt marks in it." *Id.* at 939. The court thus saw "no signs of age" and found that the "record lack[ed] *any* evidence from which a reasonable jury could conclude that the liquid had been on the floor for a period long enough to charge Target with constructive knowledge." *Id.* (emphasis added). Our case couldn't be more different. The puddle Thompson slipped on bore several of the telltale "signs of age"—from track marks to an extraneous footprint. And, given the absence of any visible spill in the hour before Thompson fell, the water must have been there for a while. *Pussinen* thus cannot guide us here.

Wal-Mart's next case—*Donnelly v. Wal-Mart Stores East, LP*, 844 F. App'x 164 (11th Cir. 2021)—is similarly unhelpful. In that case, the plaintiff slipped and fell on a clear substance that, *even after the fall*, was barely large enough to see. *Id.* at 166. And, while the plaintiff testified that she'd noticed a Wal-Mart employee in the vicinity of the puddle, the surveillance footage conclusively contradicted this assertion. *Id.* at 170. Thompson's case is, on both scores, much stronger. Not only did she testify that the puddle was substantial, *see* Thompson Dep. at 53:12–17, but the after-the-fact

---

[9] For all these same reasons, we reject Wal-Mart's view that Thompson cannot establish "the length of time the condition had existed before her fall." MSJ at 8. While no one can say precisely how long the substance was there, we can certainly infer that it had been there for many minutes—and that's enough for now.

photos back her up, *see* Pictures at 32–35.[10] And, far from contradicting Thompson's testimony, the CCTV footage in our case confirms that not one but *three* Wal-Mart employees absentmindedly ambled past the puddle just moments before Thompson fell—all without *ever* looking down at the floor. *See* CCTV 4:53:50–4:55:13.

Wal-Mart's reliance on *Hopkins v. Family Dollar Stores of Fla., LLC*, 2019 WL 1490231 (M.D. Fla. Apr. 4, 2019), fares no better. There, the plaintiff slipped and fell on a clear substance that she characterized as "gookie." *Id.* at 1. She also saw one or two dead cockroaches on the floor. *Id.* But, according to the district court, the plaintiff didn't testify that the cockroaches were *in* the liquid or that they were wet—only that they were dead *near* the liquid. *Id.* at 4. And, the court found, the Dollar Store employee had followed the business's inspection procedures—with no surveillance footage to contradict him. *Id.* at 5. Once again, our case is different. Thompson has pointed to evidence *inside* the puddle that indicates the water was there, on the floor, for some time. *See* Pictures at 32–35 (showing track marks, potentially from other shopping carts, streaking through the puddle). And we do have undisputed CCTV footage showing several Wal-Mart employees plainly violating Wal-Mart's rainy-day policies. At this stage of the case, it's our job to "draw all factual inferences in favor of" Thompson, not Wal-Mart. *Carroll*, 955 F.3d at 1262 (11th Cir. 2020).

***

While businesses "are not general insurers of their" customers, *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 726–27 (11th Cir. 2019) (Sutton, J., sitting by designation & concurring in part), they still bear certain obligations towards their customers. In our case, there's more than enough evidence for a reasonable jury to find that Wal-Mart *should have known* about the water collecting on its floor and

---

[10] For what it's worth, Virgin confirmed that he, too, saw a puddle in those pictures. *See* Virgin Dep. 51:5–13 ("Q: Do you know what could have caused those streaks? A: No. Q: Again in this photograph? A: Okay. This one yeah, I can see the water better it looks like a liquid right here.").

19

that it was *negligent* in failing to clean it. And, to the extent Wal-Mart is right—that there remain here certain unresolved, but important, factual disputes—we think it beyond cavil that the task of resolving those disputes rests squarely with a jury of laymen, not a panel of (unelected) judges. *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 343–44 (1979) (Rehnquist, J., dissenting) ("Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense, the 'passional elements in our nature,' and thus keep the administration of law in accord with the wishes and feelings of the community" (citing OLIVER WENDELL HOLMES, COLLECTED LEGAL PAPERS 237 (1920))).

After careful review, we **ORDER** and **ADJUDGE** that Wal-Mart's Motion for Summary Judgment [ECF No. 33] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 6th day of January 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record